Argued February 24, affirmed March 9, 1972

# WELCH, *Appellant, v.* STATE ACCIDENT INSURANCE FUND, *Respondent.*

494 P2d 458

*Donald M. Pinnock,* Ashland, argued the cause and filed the brief for appellant.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before Schwab, Chief Judge, and Langtry and Foley, Judges.

SCHWAB, C. J.

In this workmen's compensation appeal two questions are presented:

(1) Does the record support claimant's contention that a myocardial infarction suffered five days following his inhalation of chlorine gas while in the course of his employment was caused by the inhalation of the gas and therefore compensable?, and, if the answer to the above question is "no," (2) does the failure of the State Accident Insurance Fund to call as a witness its medical examiner warrant a remand to the hearing officer for the taking of the testimony of that medical examiner?

Our answer to both questions is "no."

■ As to the first question the Workmen's Compensation Board and the trial judge agreed with the findings of the hearing officer. So do we. They were in pertinent part:

> "The incident in question occurred as claimant was attempting to unclog a drain set in the floor under a food preparation counter and enclosed on three sides to form a basin 10 or 12 inches square. Without claimant's knowledge another employee had previously poured bleach into the clogged drain. Claimant got on his knees under the counter with his head 1½' to 2' directly over the drain and began to pour in 'liquid snake' a hydrochloric acid

based cleaner. Immediately a heavy cloud of extremely strong smelling chlorine gas issued from the drain. Claimant's first impulse was to hold his breath, and he did hold his breath, but he 'would say' that he inhaled some of the gas since he was not expecting it and it came forth suddenly in large volume. Claimant tried immediately to get out from under the counter and away from the drain, taking an estimated 10 to 20 seconds to do so. He went to a door about 50 feet away, then returned to the drain one or more times to see what was going on. I infer that after the initial surprise claimant held his breath when he was very close to the drain and did not inhale more of the fumes. There were others in the room, 50 x 100 feet, who did not leave, although the odor was very noticeable throughout the room.

"Claimant immediately felt a hurting and tightening of the chest, and a burning sensation involving the nose, mouth and lungs. The eyes were not affected. After going to the door to open it and returning to the drain he became aware of a strange copper taste in the mouth. A few minutes later he smoked a cigarette and talked with fellow employees. He, with one or two others, began work on a pot washer and continued until the work day ended about two hours after the exposure. Within a few minutes after the exposure claimant complained to two fellow employees of difficulty breathing, tightness in the chest and a funny taste in the mouth. However, neither claimant nor two fellow employees testified that claimant was coughing following the exposure.

"After the evening meal on the day in question, claimant felt queasy and spit a small amount of slime. The next day, Wednesday, claimant felt fine but noticed the strange taste intermittently and an intermittent feeling of chest tightness.

"On Thursday, claimant felt very good; his symptoms were virtually gone. On Friday, after the evening meal, he experienced the same strange

copper taste, tightening in the chest, and he spit up a little slime.

"Claimant did his usual work, full-time, Wednesday, Thursday and Friday.

"On Saturday, claimant did not feel too well. He experienced indigestion and spit up a little after the evening meal. The indigestion he experienced after the meals on the several days was relieved by soda. Claimant had formerly taken soda for indigestion, but not for two or three months prior to the gas exposure. Claimant pointed out that the spitting up of 'slime' was not a coughing up of anything, but was more like vomiting, except that apparently no food particles were involved.

"After retiring about midnight or shortly after on Saturday night, claimant experienced a severe knife-like steady pain across the shoulders and back. The pain continued and a short time later he was treated with a vaporizer on his doctor's advise. The symptoms were relieved and he slept until about 9 a.m. Sunday morning, January 18. He felt fairly good Sunday morning with no cough, no tightness and no shoulder pain. However, the copper taste had returned. After the evening meal he spit up quite a bit and felt uncomfortable. He retired about Sunday midnight. About 2 or 2:30 a.m. he experienced severe pain in his back and shoulders in the same area as the previous night, but this time the pain did not subside with the vaporizer treatment. The doctor was called and claimant was admitted to the hospital Monday morning, January 19 with the complaint of severe interscapular back pain which on the same day changed to pain in the upper anterior chest. As noted, claimant was found to have sustained a myocardial infarction.

"Significantly, on the day of admission, the treating physician found none of the physical signs of chlorine gas exposure on either examination or X-ray. Specifically, there was no cynosis, edema of conjunctive or eyelids, or features of pneumonia, or any pulmonary edema.

"Also significantly, the treating physician's hospital admission history reflects onset of pain in the upper back in short jabs radiated into the left arm and associated with numbness of the left arm seven or eight months prior to hospitalization with recurrences of five or six episodes over those seven or eight months. The pain precipitating hospitalization was described by the patient as similar to the pains which had occurred over the previous months. Claimant had a problem with high blood pressure as early as 1958, and he very probably had coronary artery disease prior to the gas exposure.

"Claimant introduced the report of Dr. Charles M. Grossman who examined claimant on May 11, 1970. Dr. Grossman concluded that the chlorine exposure was probably a significant contributing factor to the development of the myocardial infarction a few days later. Dr. Grossman does not explain his theory as to how the chlorine exposure contributed to the myocardial infarction, nor is the history entirely consistent with the testimony at the hearing and the other evidence. The lengthy recitation of history contains no reference to the seven or eight months of prior episodes of pain, nor is there any indication that Dr. Grossman knew of or considered that background.[1]

---

[1] Dr. Grossman was not the treating physician. As pointed out by the hearing officer he did not see the claimant until May 11, 1970. The written report of the treating physician, Dr. Harvey A. Woods, stated in pertinent part:

"* * * Mr. Welch had a preexisting condition, revealed in his history taken at the hospital, of symptoms origination seven to eight months prior to the myocardial infarction that could be interpreted as cardio vascular * * *.

"* * * * *

"On January 19, 1970, four days after the exposure to the fumes I did not find the above physical signs [the consequences of the chlorine gas incident] * * *.

"* * * * *

"I am unable to state that the myocardial infarction resulted from the exposure to the fumes, and also I am unable to state that the fumes had a causative effect on the preexisting condition."

"Neither Dr. Grossman nor the Fund's Dr. Parcher, both of whom surveyed the available medical literature, found substantial support for the proposition that chlorine gas exposure of the degree established in this case may be materially causally connected to a myocardial infarction.

"Upon consideration of the totality of the evidence, and noting particularly the history of prior episodes of similar pain over seven or eight months before the gas exposure, the absence of any of the physical signs of gas exposure just a few days later, the dearth of medical literature supporting a causal connection, and the historical and explanatory omissions in the report of claimant's medical expert, I am constrained to conclude that claimant has failed to establish that the chlorine gas exposure on January 13, 1970, was a substantial contributing cause of the myocardial infarction for which claimant was hospitalized on January 19, 1970."

■ The State Accident Insurance Fund had the claimant examined by a Dr. Heyerman of Medford, Oregon. In fact, the Fund asked that the hearing be rescheduled in order for the state to obtain the examination. The doctor was not called by the Fund and no explanation was offered by the Fund as to why no evidence was offered as to the results of that examination. When the Fund rested its case the claimant did not ask the state to produce a report from the doctor or even develop that the doctor had written a report, did not ask the Fund to call the doctor and did not ask for a continuance so that he might subpoena the doctor to appear before the hearing officer as authorized by ORS 656.283(7). Rather, he merely established in rebuttal that claimant had been examined by Dr. Heyerman. Upon oral argument before this court claimant's counsel candidly conceded that he did not do so because, not knowing what Dr. Heyer-

man might say, he did not want to take the chance of introducing into the record evidence adverse to his client's position. Nothing in the record indicates what, if any, conclusions Dr. Heyerman reached. Under these circumstances we agree with the Workmen's Compensation Board and the trial judge that a remand is not warranted.

Affirmed.